(No. 86-CC-1891—

PETER ROELS, Claimant, *v.* THE BOARD OF GOVERNORS OF STATE COLLEGES AND UNIVERSITIES, and EASTERN ILLINOIS UNIVERSITY, Respondents.

*Opinion filed January 13, 1995.*

*Order on petition for rehearing filed April 12, 1995.*

LAWRENCE T. RUDER, for Claimant.

DUNN, ULBRICH, HUNDMAN, STANCZAK & OGAR (DAVID S. DUNN, of counsel), for Respondents.

## OPINION

RAUCCI, J.

This cause comes before us after hearing on Claimant Peter Roels' claim for damages for personal injuries suffered on April 20, 1985, while participating in the Pepsi Invitational Track Meet sponsored and hosted by Respondent Eastern Illinois University (EIU) which is

under the jurisdiction of Respondent Board of Governors of State Colleges and Universities.

A discussion of the evidence is necessary for the disposition of the claim. Claimant was a pole vaulter who represented William Rainey Harper Community College at the meet. Pole vaulting is considered to be an inherently dangerous event. The pole vaulter first sprints down a runway which is 170 to 180 feet long. As the athlete approaches the landing area he plants his pole into a "planting area." His speed and upper body technique should ideally provide sufficient momentum to carry him to heights ranging from 13 to 16 feet. He should have sufficient height to vault over a cross bar. He then descends into a landing area comprised of sections of foam padding. A vaulter "stalls out" when he has insufficient momentum to carry him through the vault. It is a common occurrence during pole vaulting.

The landing area or pit is where the vaulter lands after his jump. A "planting box" is located immediately in front of the main landing area. To each side of the planting box are U-shaped pads (aprons). A separate foam pad or plug is adjacent to and immediately next to the planting box. It is typically secured to the main landing pad with hooks. Directly behind the plug are the various areas of the landing area. Claimant alleges that the pads which comprise the landing area are to be covered with a spike pad. The spike pad is intended to protect the vaulter's lower extremities from entering the space between the foam pads. The spike pad is secured to the foam pads by hooks which are intended to prevent the spike pad from sliding. The thrust of Claimant's position is that there was a better design available than the one used at EIU.

Prior to the injury, Claimant was, as would be expected, in good physical health and suffered no physical

limitations. The night before the meet he had consumed beer, and felt drunk.

Before he vaulted, he had the opportunity to examine the landing area, and normally he did. On this occasion, however, he did not "make a conscious effort" to do so. He did not at any time walk up to the area with the objective of inspecting it even though he had not previously used a mat of this type. He did not observe any defect.

During a warm-up practice vault, Claimant was injured when he stalled out during an attempted 15-foot vault. Claimant, who had been taught to land on his back or to ride the pole down when possible landed feet first because he thought it was the safest way. When he descended facing the runway (with his back to the pit) "the next thing I knew, my foot had gone through the pieces of the mat." Claimant's right foot had impacted the pole vault landing area and entered an exposed opening between the foam pad called the plug and another pad which comprised the main landing area. Claimant maintains that the area should have been covered by the device known as a "spike mat" or "spike pad." His right foot impacted the ground under the landing area and broke his right ankle. Claimant received emergency treatment in Charleston, and at Lutheran General Hospital in Des Plaines, Dr. Paul Katz performed reconstructive surgery on Claimant's right ankle. Claimant was hospitalized at Lutheran General Hospital for 10 days. His medical expenses to date total $11,364.77.

Claimant testified that he can't participate in activities that use his leg without suffering pain.

Neil Moore testified that he was the head track coach at EIU and was director of the meet. He had 30 years experience coaching track and field events. As host,

Eastern was responsible for conducting the meet and insuring that the athletes competed under safe conditions. EIU had hosted the Pepsi Invitational Track Meet for about five years preceding the 1985 meet. EIU had also hosted the NCAA Division II and III national track meets at the same track at the same time. It was the only time that both events had been hosted at the same time by an institution in the history of the United States. During Moore's 15 years at EIU, the school had hosted approximately 10 meets per year.

Moore had purchased the pit approximately three years prior to the 1985 Pepsi meet. When he bought it, he believed that it was the first of its type, and was impressed favorably with it. "It was a prototype. It set the trend." He believed that the pit met all of the specifications of the NCAA regulations.

The officials for the meet were two injured "outstanding vaulters" who were EIU students, Mark Hamilton and Roxy Wood. They had other helpers also. Officials have complete authority to deal with shifting of the pit during competition. During meets, Moore watched as closely as possible to assure that the meet was run efficiently, safely and on schedule. Moore, on the occasion of the 1985 Pepsi meet, had extra work done to make the pit as safe as possible. He wasn't satisfied with the area around the planting box, and had tied the steel rings attached to the apron and plug with very strong nylon cords about the size of the little finger to give additional support. He did this because the pit sometimes shifts and might need to be adjusted.

Athletes can object to unsafe conditions. Moore testified that if the plug is fastened without the nylon cords, it is loose and that is why he ties the plug to the main pit with the cord. The bond is much tighter with the cords

than without the cords. He last inspected the pit about an hour before the competition.

Moore testified that on the day in question, all three rings across the top of the plug were tied as well as additional plugs on the sides. He was familiar with the manufacturer's instructions for assembly, and the pit was assembled in conformity with those instructions. Additionally, he had taken additional precautions with the nylon cord tied in the plug area.

Moore testified that he was about 55 feet away from the pit when Claimant made his vault. On Claimant's cross-examination, he testified that while he did not see Claimant land, he did observe the vault. He felt that Claimant took a bad fall and ran to the pit. In response to Claimant's counsel's question of what he observed that led him to feel this way, he stated

"Well, because of his indecision at the time when the pole stopped moving, the pole stalled out and it had not come to a complete vertical. If it had, he could have gotten off into the main pit. It had a slight lean and the longer he waited, the more it started coming back and then he was forced to bail out."

On redirect, he testified that most experienced vaulters recognize that an exposed gap between pads is dangerous, and that vaulters can stop and object to a dangerous condition. Additionally, he testified that if the spike cover had moved to expose an opening, it would have been readily observable.

We have often stated the rule that the Claimant bears the burden of establishing by a preponderance of the evidence that Respondent breached its duty of reasonable care, that the negligence of Respondent proximately caused the injury, and that the Respondent had actual or constructive notice of the dangerous condition from all the circumstances in the case. *Berger v. Board of Trustees of the University of Illinois* (1988), 40 Ill. Ct. Cl.

120; *Rossett v. State* (1985), 37 Ill. Ct. Cl. 118; *Talbott v. State* (1983), 45 Ill. Ct. Cl. 885; *Hitt v. State* (1982), 35 Ill. Ct. Cl. 798; *Claycomb v. State* (1981), 35 Ill. Ct. Cl. 200; and *Nolan v. State* (1983), 36 Ill. Ct. Cl. 194.

The evidence indicates that the Respondents exercised reasonable care in assembling the landing area. There is no evidence that Respondent had either actual or constructive notice of the alleged defect. The existence of a better design, as alleged by Claimant, imposes no duty on Respondent in the absence of evidence that the device used was not safe. Moore testified that the landing area was properly assembled, and that he examined it about an hour before the meet. Claimant did his practice vault before the start of the meet. There is no evidence that anyone had notice of the alleged defect prior to the accident. Claimant did not notice it, the officials did not notice it, and Moore did not notice it.

The evidence indicates that one proximate cause of the Claimant's injury was the manner in which he completed the vault which was contrary to the way he was taught to land.

Claimant has failed to meet his burden of proof and the claim should be dismissed.

It is therefore ordered, adjudged and decreed that this claim be, and it is hereby, dismissed with prejudice.

## ORDER

RAUCCI, J.

This cause coming on to be heard on the Claimant's petition for rehearing, the Court being fully advised in the premises, the Court finds:

We have considered the Claimant's petition for rehearing and the arguments contained therein, and we find that our original opinion should stand.

It is therefore ordered that the Claimant's petition for rehearing is denied.